# US DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION-DETROIT

**UNITED STATES OF AMERICA**

       **Plaintiff,**

**v.**                        **Case No. 19-20322**
                                     **Hon. Mark Goldsmith**

**D-14 WAYMON HARRIS,**

       **Defendant.**

_____/

| | |
|---|---|
| UNITED STATES ATTORNEY | AMBERG & AMBERG, PLLC |
| Jerome Gorgon | James W. Amberg (P68564) |
| Timothy P. McDonald | Attorney for Mr. Harris |
| Attorney for the Government | 32121 Woodward Ave, Ste PH |
| 211 W. Fort Street, Suite 2001 | Royal Oak, MI 48073 |
| Detroit, MI | 248.681.6255 office |
| 313.226.0221 office | 248.681.0115 fax |
| Timothy.mcdonald@usdoj.gov | www.amberglaw.net |

_____/

### SUPPLEMENTAL BRIEF TO MOTION TO SUPPRESS

### *Certificate of Service*
_____

Now comes Waymon Harris, by his CJA attorney James Amberg, and supplements his motion as follows:

### Statement of the Case

Mr. Harris moved the Court to suppress all evidence and derivative evidence stemming from the stop and search of his vehicle on April 24, 2018.  (See ECF 625)  Mr. Harris argued that the stop itself was unlawful, that the length of detention of the stop prior to the use of the drug dog was unlawful, and that nothing was known about the reliability of the drug dog 'Otto.'

It is important to note that at the time the motion was filed, Mr. Harris's knowledge of the foundational basis for the stop was Trooper Sonstrom's report

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET
(248) 681-6255

and patrol vehicle camera video. In his report, Trooper Sonstrom stated that he had stopped Mr. Harris for speeding. There was nothing in the report, nor on the video, mentioning the overarching drug conspiracy investigation or orders for Trooper Sonstrom to pull over and search Mr. Harris. Instead, it appeared from the report that Trooper Sonstrom requested consent to search the vehicle, which was denied. He then walked Otto quickly around Mr. Harris's vehicle before opening the door and entering. At this point, he discovered the drugs in question.

The Government responded to this motion, arguing: (1) the traffic stop was reasonable because of Trooper Sonstrom's alleged observation of speeding; (2) that reasonable suspicion was present to stop due to the federal investigation independent of anything Trooper Sonstrom had observed; (3) that the length of detention was reasonable; (4) that a trained and reliable canine alerted to the presence of narcotics, which then gave probable cause to search the vehicle, and (5) that the Kensington search warrant would survive even if the stop evidence was suppressed.

The hearing was conducted over a two-day period. On the first day, the Government called two witnesses, Agent John Hill and Trooper Ben Sonstrom. (See ECF 644: Evidentiary Hearing Day 1) The second day involved the testimony of defense witness, Dr. Mary Cablk. (See ECF 704: Evidentiary Hearing Day 2)

Agent Hill

Agent Hill testified that on April 24, 2018, he formulated a plan with a confidential source to meet with Mr. Harris and negotiate the purchase of a kilogram of heroin. (ECF 644: Pg ID 3679) This meeting then occurred in Detroit around 12pm. (ECF 644: Pg ID 3679-3680) Mr. Harris and the informant then met for 50 minutes. (ECF 644: Pg ID 3682) Afterwards, the informant told Agent Hill that they and Mr. Harris negotiated a deal for one kilo of heroin at $65,000,

2

with an option for a second kilo on consignment for an additional $20,000, and Mr. Harris agreed to first provide a sample so the informant could assess the quality of the product.  (ECF 644: Pg ID 3683-3684)

At some point later that day, Agent Hill monitored a phone, via speakerphone, call between the informant and Mr. Harris where Mr. Harris was going to come back to the informant's location with a sample.  (ECF 644: Pg ID 3685-3687)  Around 2:30pm, a meeting between the informant and Mr. Harris ensued, and afterwards, the informant provided the Agent with a sample size quantity of heroin.  (ECF 644: Pg ID 3687)  During this meeting, the informant indicated that Mr. Harris could only provide 500 grams of heroin.  (ECF 644: Pg ID 3687)

At approximately 3pm, Agent Hill had the informant call Mr. Harris to discuss the 500 grams of heroin.  (ECF 644: Pg ID 3688)  This call was monitored by Agent Hill.  (ECF 644: Pg ID 3688)  During the call, the informant told Mr. Harris he needed the drugs by 6pm.  (ECF 644: Pg ID 3689)

Around 5:25pm, Agent Hill had the informant contact Mr. Harris to follow up on the drug transaction.  (ECF 644: Pg ID 3689)  Mr. Harris indicated that he had the 500 grams.  (ECF 644: Pg ID 3690)  During this time, law enforcement was surveilling Mr. Harris.  (ECF 644: Pg ID 3692)  The anticipated meeting to consummate the drug transaction did not happen because shortly after the final communication between Mr. Harris and the informant, Mr. Harris was stopped by Trooper Sonstrom, which apparently was part of Agent Hill's plan.  (ECF 644: Pg ID 3693)

Agent Hill indicated that "[w]e briefed and planned to have Mr. Harris pulled over on his way to meet with the source and then ultimately have his vehicle searched and the drugs found and seized."  (ECF 644: Pg ID 3693; Lns 1-5)  Per

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

3

Agent Hill, he believed it was Agent Garvis who told Trooper Sonstrom to stop Mr. Harris.  (ECF 644: Pg ID 3694)  Regarding what he told Agent Garvis, Agent Hill stated "I explained the last call, that Mr. Harris was on the way with 500 grams to meet the confidential source, so I explained to Special Agent Garvis that I believed Mr. Harris was driving with the 500 grams of heroin."  (ECF 644: Pg ID 3694; Lns 19-23)

Regarding Trooper Sornstrom, Agent Hill testified that he had used Trooper Sornstrom at least five previous times in stopping individuals.  (ECF 644: Pg ID 3713)  Agent Hill did not talk directly with Trooper Sonstrom.   (ECF 644: Pg ID 3713)

Extremely important to this supplemental brief is what Agent Hill testified to his past experiences with Trooper Sornstrom's stops and dog use by stating that "[i]f the dog gave the positive indication on the vehicle that Trooper Sonstrom determined that that vehicle contained the odor of drugs at one point or another in that vehicle, then yes, Trooper Sonstrom would then search the vehicle."  (ECF 644: Pg ID 3714; Lns 9-13)  When asked whether it was Trooper Sonstrom's decision to search Mr. Harris's vehicle, Agent Hill indicated that "if there's other factors present and there's no consent or there isn't a hit from the canine, then it's brought back to our attention and then we determine whether we believe we have enough probable cause and relay that why we think we have probable cause to Trooper Sonstrom or any officer making the stop and then ultimately based on the information we give them in our version of probable cause, that officer or Trooper Sonstrom is ultimately the last person to decide yes, I'll go ahead and search the vehicle."  (ECF 644: Pg ID 3724; Lns 23-25; 3725, Lns 1-8)

Trooper Sonstrom

4

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

At the time of the stop, Trooper Sonstrom was employed as a State Trooper and assigned a canine partner, Otto.  (ECF 644: Pg ID 3736)  Both he and Otto were certified in the detection of narcotics by the State Police.   (ECF 644: Pg ID 3737)  Trooper Sornstrom testified that Otto communicated drug odor to him in different ways, via what he called "noticeable differences." (ECF 644: Pg ID 3738; Lns 14)  According to Trooper Sonstrom, Otto had a final response to sit when detecting drug odors.  (ECF 644: Pg ID 3739)  He also said that Otto would do a head snap back to the source of the odors and not want to leave the area where the smell was.  (ECF 644: Pg ID 3739)  Trooper Sonstrom also claimed the following, which as we will learn later, is contrary to Otto's training records:

> "So a final response we train them to sit so if he puts his nose right on a, say for example we have a source on the ground there with cocaine in it and his nose is right there, he'll sit right down. If I take that narcotic and I put it at a distance away and he's got to get to it and he smells it and if he's not right up to it in that heavy odor, he's not going sit, he's going to have those just noticeable differences, those behavior changes."   (ECF 644: Pg ID 3739; Lns 4-11)

Regarding the stop itself, although he did not remember all the details, Trooper Sonstrom testified that he was requested to assist the FBI in Mr. Harris's case.  (ECF 644: Pg ID 3740)  Prior to the stop, he was told that Mr. Harris was suspected of transporting narcotics.  (ECF 644: Pg ID 3741)  According to the Trooper, Mr. Harris was speeding, doing 80 mph in a 55 mph zone.  (ECF 644: Pg ID 3744)

Once stopped, Trooper Sonstrom testified, based on viewing the windshield of his dash cam video, that it was a light to medium rain.  (ECF 644: Pg ID 3746)  Trooper Sonstrom requested Mr. Harris exit his vehicle and sit in his patrol car.  (ECF 644: Pg ID 3748)  The Trooper patted down Mr. Harris for firearms because he was conducting a narcotics investigation and drugs and guns go together.  (ECF 644: Pg ID 3748)

Eventually, Trooper Sonstrom took Otto out to sniff the vehicle. (ECF 644: Pg ID 3750) He admitted that Otto never did a final response. (ECF 644: Pg ID 3750) Instead, Trooper Sonstrom, while watching the video claimed that "[s]o I pause, his nose is up towards, it's hard to see exactly where, but his nose is up towards the door seam of the vehicle." (ECF 644: Pg ID 3751; Lns 10-12) Trooper Sonstrom seemed to explain this phenomenon with Otto has "when we're coming back, he's coming back and it's not just a pause, it's pause and then the head snap." (ECF 644: Pg ID 3751; Lns 18-19) Trooper Sonstrom also claimed that Otto was pulling him back to the odor source. (ECF 644: Pg ID 3752; Lns 6-8)

Of course, as will be discussed, none of this is visible on the patrol vehicle, of which the entirety of the sniff walk was less than 40 seconds. There is no pulling seen on the video, no head snaps, no sitting, or anything else. Instead, what can be concluded from watching the video is that Trooper Sonstrom was leading Otto around the vehicle for a very short period before he entered it.

On cross examination, Trooper Sonstrom admitted that in the five-year period where he was working in this arena, that he had done approximately 100 similar stops involving narcotic officer requests. (ECF 644: Pg ID 3758; Lns 2-5) Although Trooper Sonstrom claimed there was "a great amount of probable cause or suspicion" to stop Mr. Harris, he couldn't "recall all the information from that day." (ECF 644: Pg ID 3759; Lns 1-5) Further, he admitted to not including any of the drug investigation in his police report and instead, the report read like he stopped Mr. Harris solely for speeding. (ECF 644: Pg ID 3758; Lns 6-11) Interestingly, Trooper Harris felt this method of not including the drug information was "honest" even though anybody who read his report would have reached the

6

conclusion that the stop was based solely on the traffic stop.  (ECF 644: Pg ID 3758; Lns 18-24)

Viewing the patrol car video, the supposed speeding is not captured, so we are forced to rely on Trooper Sonstrom's honesty, which given his penchant for misleading reports, is a tough pill to swallow.

After stopping Mr. Harris for speeding, Trooper Sontrom had Mr. Harris immediately exit his vehicle and ordered Mr. Harris into his patrol vehicle.  (ECF 644: Pg ID 3763; Lns 4-6)  Trooper Sonstrom did admit that during this time he had Mr. Harris's driver license, ultimately indicating that because of this, Mr. Harris was not free to go.  (ECF 644: Pg ID 3764; Lns 1-8)  Trooper Sonstrom did not write Mr. Harris a traffic ticket.  (ECF 644: Pg ID 3764; Lns 15-16)

Regarding searching the vehicle, Trooper Sonstrom did not remember whether he was told by law enforcement to search Mr. Harris's vehicle.  (ECF 644: Pg ID 3764; Lns 19-23)  The Trooper admitted he did not have Mr. Harris's permission to search the car.  (ECF 644: Pg ID 3764; Lns 20-24)  In a perplexing answer, Trooper Sonstrom seemed to imply that he was attempting to develop his own probable cause to search the vehicle.  (ECF 644: Pg ID 3765; Lns 4-10)  One factor that Trooper Sonstrom thought important to his probable cause analysis was when somebody asserts their Constitutional Right to not allow a search, or in other words, asserting a Constitutional protection against a search would allow Trooper Sonstorm to search.  (ECF 644: Pg ID 3767; Lns 12-19)  Given this is the mentality of Trooper Sonstrom, it is not surprising that his side hustle business's motto is "peace through violence."  (ECF 644: Pg ID 3770; Lns 18-24)

Otto was Trooper Sonstrom's drug dog, which also was the first drug dog that he trained.  (ECF 644: Pg ID 3769; Lns 11-12)  Trooper Sonstrom indicated that he participated in a 14-week course.  (ECF 644: Pg ID 3770; Lns 2-7)  As to

7

the concept of validating Otto's alleged drug sniffing, Trooper Sonstrom gave the following confusion answer:

> "So it's all based on the training and experience of the handler, of the dog 'cause every dog is different. It's based on we look at our training records, how we document, what our dog does and we kind of put those together so for example just noticeable differences, the ones, you know, my partner over here who has a dog might be doing things a little differently than mine because the dogs' behaviors are different. So every dog has different behaviors." (ECF 644: Pg ID 3772; Lns 4-11)

Ultimately, Trooper Sonstrom admitted that "the initial stiff gave me probable cause to believe that there was narcotics in the vehicle based on Otto's change of behaviors." (ECF 644: Pg ID 3773; Lns 9-11)

Although Trooper Sonstrom admitted that he was the only law enforcement officer who trained with Otto, he could not recall things like Otto's false positives, test results, or accuracy in the rain. (ECF 644: Pg ID 3776-3777) Trooper Sonstrom also admitted that there can be handler error as well. (ECF 644: Pg ID 3777; Lns 17-22)

### Dr Mary Cablk

Retired college professor Dr. Cablk testified as a defense expert concerning the accuracy and reliability of Otto and of the drug sniff allegedly observed in Mr. Harris's case. Dr. Cablk indicated that her expertise was in the use of dogs to gather information via olfaction. (ECF 644: Pg ID 4413, Lns 11-23) Dr Cablk indicated that she had studied canines and canine team reliability, published papers, and given lectures around the world on behalf of the Department of Defense, all related to canine olfaction. (ECF 644: Pg ID 4414) Dr. Cablk discussed in detail the principles of training a narcotics dog to recognize odor. Of major import to this brief is the notion that when a dog locates a particular odor it "does its trained final response, typically a sit or a down, sometimes a focused stare." (ECF 644: Pg ID 4419, Lns 6-10) Per Dr. Cablk:

"A final response is the one behavior, it's a trained behavior that is definitive for target odor. It -- there's no question when the dog goes to final response by sitting or laying down, in this instance I believe the canine had a sit. When the dog goes to final response, it sits. That is the significant, unarguable for the most part indicator that the dog has located target odor." (ECF 644: Pg ID 4419, Lns 13-19)

Dr. Cablk explained that dogs have a variety of behaviors called "antecedent behaviors," which are a "bunch of things that the dog does when it first gets odor, its trying to figure out where it's coming from." (ECF 644: Pg ID 4419, Lns 20-23) Importantly, "[t]hese are innate behaviors, they're often called alert behaviors, they're not trained." (ECF 644: Pg ID 4419, Lns 23-24) Instead, the dog handlers much time "achieving and maintaining like the sit, that is the one behavior that is definitive." (ECF 644: Pg ID 4419, Ln 25; Pg ID 4420, Ln 1)

Dr. Cablk shed more light on antecedent behaviors, explaining by example that "[d]ogs sit and lay down, you know, at home, they do it for all kinds of reasons and that doesn't mean that the dog is responding to their target odor." (ECF 644: Pg ID 4422, Lns 6-8) Regarding training, Dr. Cablk agreed that a dog's antecedent behaviors should be discussed in its training records. (ECF 644: Pg ID 4425, Lns 2-8) Specifically, Dr. Cablk agreed to counsel's question that "if a dog is exhibiting head snapping or maybe wagging their tail or something to indicate narcotic odor, would you expect that to be in the training records that that's happening." (ECF 644: Pg ID 4426, Lns 7-11) Dr. Cablk testified that she would expect a dog to have training records. (ECF 644: Pg ID 4421, Lns 3-5)

An important area of conversation with Dr. Cablk was the concept of "handler bias." (ECF 644: Pg ID 4427, Lns 14-16) Dr. Cablk explained that "[r]esearch has shown that when handlers have bias in terms of belief like I believe there's target odor present in my search area, that that affects the outcome of the sniff." (ECF 644: Pg ID 4427, Lns 23-25) Although not impossible,

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

Dr. Cablk indicated that it's really hard to overcome our bias" and "[t]hat's part of why the trained final response is so important because it takes, it takes the onus of who is deciding whether there's narcotics odor her or not, it takes that off the human."  (ECF 644: Pg ID 4427, Ln 25; Pg ID 4428, Lns 1-5)

Dr. Cablk then discussed her viewing of the exhibits, including the dash camera video, the training records, the transcripts of Trooper Sonstrom's testimony, and the motions that were filed.  (ECF 644: Pg ID 4429, Lns 14-18) Watching the video in court, Dr. Cablk made the following observations.  First, Otto did not exhibit a final response.  (ECF 644: Pg ID 4432, Lns 13-17)  Dr. Cablk explained that she had a chance to go through Otto's records and Otto would sit as his final response.  (ECF 644: Pg ID 4433, Lns 1-8)  Per Dr. Cablk, Otto's training records indicated that he was extensively trained to sit for a final response and did so reliably.  (ECF 644: Pg ID 4434, Lns 17-25; Pg ID 4435, Ln 1)  It appeared Otto was trained to detect narcotic odors in a typical operational environment, which Dr. Cablk suggested would likely include training in the rain.  (ECF 644: Pg ID 4435, Lns 6-13)  Even in the rain, Dr. Cablk explained that the training records indicated Otto would "would sit reliably over and over and over again for years of training records."  (ECF 644: Pg ID 4435, Lns 18-25; Pg ID 4436, Ln 1)

Dr. Cablk also testified about antecedent behaviors discussed in the training records, stating that "the handler referred quite a bit to what he calls a just noticeable difference and he did refer to changes in breathing, mostly increased sniffing, and that's the majority of what is put forward is what they call the JND, the just noticeable difference."  (ECF 644: Pg ID 4436, Lns 12-16)    Regarding head snapping, nothing stood out to Dr. Cablk in Otto's records concerning this trait.  (ECF 644: Pg ID 4437, Lns 18-23)

10

Viewing the video, Dr. Cablk commented that Otto was being "compliant with his handler," "he does point his nose toward the vehicle, but he doesn't change his pace," "[h]e does not resist leaving any part of the vehicle," and "he goes around with his handler and then all of a sudden the handler opens the door and puts the dog inside." (ECF 644: Pg ID 4438, Lns 4-9)  Dr. Cablk thought putting Otto into the vehicle in this manner put Otto "in an unnecessary hazardous situation" because of concerns of the dog inhaling the potential narcotics.  (ECF 644: Pg ID 4438, Lns 12-22)

Dr. Cablk next opined as to the potential for bias of Trooper Sonstrom.  (ECF 644: Pg ID 4439)  Dr. Cablk indicated that:

> "If you believe something to be true, then you are going to look for signals, real or otherwise, that confirm your belief and in Trooper Sonstrom's testimony, he said he believed there were drugs in the vehicle and he was told to search the vehicle, so that information in my opinion contributed to misinterpreting the canine." (ECF 644: Pg ID 4439, Lns 11-18)

Dr. Cablk then summed up the situation with bias by stating that "[i]f Otto had come out of the patrol car, gone over to Mr. Harris's vehicle, sniffed independently at the end of the leash pulling his handler, exhibiting behaviors such as not wanting to leave any area of the vehicle and then sat, I wouldn't be here." (ECF 644: Pg ID 4439, Lns 22-25; Pg ID 4440, Ln 1)

Dr. Cablk also drafted a report, which was admitted into evidence.  (ECF 644: Pg ID 4440, Lns 10-16)  Dr. Cablk's opinion was as follows:

A. K9 "Otto" did not go to final response outside the vehicle.
B. Training records show K9 "Otto" reliably performed his final response (a sit) to narcotics in all manner of hidden presentations.
C. Trooper Sonstrom received biasing information prior to the traffic stop.
D. Having been directed to conduct a search of Harris's vehicle and lacking proper training protocols to address bias brings into question the reported alert. (See **Exhibit C**, Dr. Cablk Report introduced at the evidentiary hearing)

11

**Law and Argument**

"A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013)(cleaned up). *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) ("Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." (cleaned up)); *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (describing probable cause as "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion"). When analyzing probable cause, courts "examine the totality of the circumstances from the perspective of the officer at the time of the incident." *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003).

"A dog sniff conducted during a ... lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Illinois v. Cabalees*, 543 U.S. 405, 410 (2013).  A trained police dog's alert to the presence of narcotics can create probable cause for a subsequent search of the vehicle if "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, supra at 248.

The central question in this case is whether Trooper Sonstrom had probable cause to search Mr. Harris's vehicle.  It may be the case that the Government contends that there was probable cause to search the vehicle independent of Trooper Sonstrom's drug dog sniff.  To counter this, it is first pointed out that although Agent Hill suspected Mr. Harris of transporting narcotics, he testified that

12

he and other agents would use Trooper Sonstrom to pull people over for the purpose of having a drug dog sniff the car.  We know this because Agent Hill testified that "[i]f the dog gave the positive indication on the vehicle that Trooper Sonstrom determined that that vehicle contained the odor of drugs at one point or another in that vehicle, then yes, Trooper Sonstrom would then search the vehicle." (ECF 644: Pg ID 3714; Lns 9-13)  What else could this mean other than there was not sufficient probable cause prior to the dog sniff.  At most, the requests of the agents gave no authority to search, but instead simply reasonable suspicion to stop the vehicle and continue the investigation.

Agent Hill also testified that "if there's other factors present and there's no consent or there isn't a hit from the canine, then it's brought back to our attention and then we determine whether we believe we have enough probable cause and relay that why we think we have probable cause to Trooper Sonstrom or any officer making the stop and then ultimately based on the information we give them in our version of probable cause, that officer or Trooper Sonstrom is ultimately the last person to decide yes, I'll go ahead and search the vehicle." (ECF 644: Pg ID 3724; Lns 23-25; 3725, Lns 1-8)  This clearly put the onus on Trooper Sonstrom to make the final decision on probable cause.  Beyond that, it is unclear whether this even happened in the case at hand.

Trooper Sonstrom's probable cause was based on Otto's alleged "change of behaviors."  But the reliability of these behaviors is questionable and highly suspect.  First, Otto's training records indicate that Otto reliably sat as a final response to the presence of narcotics.  Dr. Cablk testified that for years of training records, Otto would sit if he smelled drugs.  This was in typical environments, including rain.  Yet Otto did not sit in this case.

13

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

Second, the head snap that Trooper Sonstrom testified to that was not seen on the video was nothing more than an antecedent behavior at best.  And we know that it was not a significant antecedent behavior because it appears that Trooper Sonstrom did not seem to mention this behavior in the training records, like he was required to.  This is further evidenced by the fact that Trooper Sonstrom did evidence other antecedent factors such as breathing differences.

Third, Trooper Sonstrom had extreme bias.  Although Trooper Sonstrom would never admit to it, the Court must ask itself why it seems that agents appear to very frequently use Trooper Sonstrom to stop and search individuals that they speculate might be transporting drugs.  Trooper Sonstrom already knew what the agents wanted, they wanted him to search the car, so he did so.  Otto's supposed head snap was nothing more than a ruse.  If it wasn't, why then would Trooper Sonstrom have written a misleading and dishonest police report that completely omitted the entirety of the drug investigation of Mr. Harris?

Fourth, the video speaks for itself.  Nowhere in the video does Otto pull Trooper Sonstrom toward the vehicle, as instead it is Trooper Sonstrom that leads Otto around.  The total amount of time of the sniff was extremely short and Trooper Sonstrom did not even give Otto the chance to do a final response.  There is no visible head snap, no pawing at the vehicle, no breathing differences.  Instead, it looks like Trooper Sonstrom simply walked around the vehicle to put a show on for the camera before entering the car.

The Government may contend that probable cause was sufficient because under *Florida v Harris* "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris*, 568 U.S. at 246.  But while this might be a factor, the test for probable cause with a dog sniff is just like any other police officer search analysis,

14

namely it is a "totality of the circumstances" analysis. *Id.* at 244  This is a critical point that was discussed by the Supreme Court, namely that "**even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions**." *Id*. at 247 (emphasis supplied).  This is exactly the situation we have here.

The Court should not accept Trooper Sonstrom's subjective determination that Otto has made some otherwise undetectable alert, which conclusion would be, for all practical purposes, immune from review.  Given the nature of the constitutional right at issue, the Supreme Court has found this premise to be unacceptable. "If [an officer's] subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Beck v. Ohio,* 379 U.S. 89, 97 (1964).  To allow a search predicated upon an officer's interpretation of the utterly minimalist lesser showing exhibited by the dog in this case would be tantamount to permitting law enforcement officers to issue their own search warrants based upon their own subjective analysis, something the Framers explicitly prohibited.

In *United States v. Rivas*, 157 F.3d 364 (5th Cir. 1998), customs officials at the Brownsville, Texas, Port of Entry led a drug detection dog around the perimeter of what appeared to be an empty auto transport trailer Rivas was hauling with his Kenworth truck.  In reality, the trailer held forty one-kilogram bricks of cocaine secreted in its steel frame.  According to the customs officials, the detection dog deployed around Rivas' trailer was trained to indicate actively; the dog would alert by aggressively scratching or attempting to bite at the source of the odor. *Id*. at

15

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

368.  The dog, however, did not alert but instead "cast," according to the customs official.  When the official was asked what was meant by the term "cast," he replied, " 'casting' is in a sense the dog maybe feels not a strong alert, but something that temporarily stops him and deters his attention at that point." *Id*. The *Rivas* court concluded that a dog's "casting" was too distantly related to an alert to create reasonable suspicion on its own as a matter of law, thus affirming the suppression of the drugs seized from the trailer. *Id*.

It is argued that even if everything Trooper Sonstrom claimed was true and a head snap occurred that somehow tipped him off to drugs in the car, it is argued that this alone was far too distantly related to an alert to create probable cause to search.

In *United States v. Heir*, 107 F. Supp. 2d 1088 (D. Neb. 2000), Chief Judge Kopf of the Nebraska Federal Court adopted the Magistrates' opinion of suppressing evidence resulting from a dog sniff that lacked probable cause.  In that case, the Court reasoned that:

> "After reviewing the extensive testimony that was presented to Magistrate Judge Piester and watching the videotape of the canine sniff (Exhibit 101), I agree with his determination that dog's actions did not positively signal the presence of drugs inside the vehicle. Trooper Duis testified that in this case Robbie "alerted" to the presence of drugs by sniffing more intensely around certain areas of the car, but he acknowledged that such "alert" behavior was subtle and might only be recognized by himself or another person who was familiar with Robbie's tendencies. Although Robbie was trained to "indicate" (by scratching) when he located the strongest source of the drug odor, he did not do so in this case. Defendants' experts testified that the "alert" behavior described by Trooper Duis could easily be attributed to his "cuing" of the animal, either intentionally or unintentionally, by changing the leash from one hand to the other, by stopping, by blocking the way, or by other actions. They saw nothing on the videotape to indicate that Robbie had detected the presence of drugs." *Id*. at 1091

Similar to Mr. Harris's arguments in the case at hand, the *Heir* Judge found that because "the canine sniff did not provide probable cause for the search, I also find it unnecessary to assess Robbie's [the dog] qualifications." *Id*.  Further, Judge

16

Kopf found that "even if the 'alert' behavior described by Trooper Duis had in fact occurred, this is too subjective a standard to establish probable cause," and that that "there must be an objectively observable 'indication' by the dog of the presence of drugs. *Id.* (citing *United States v. Jacobs*, 986 F.2d 1231 (8th Cir.1993)(warrant affidavit stating that drug sniffing dog had displayed interest in package, without disclosing that no 'alert' had occurred, rendered warrant invalid)).  Judge Kopf held that "[b]ecause it is undisputed that Robbie did not positively 'indicate' the presence of drugs in the vehicle, as he was trained to do, there was no probable cause for the search." *Id*

This is the exact situation we have here.  Even under the best of circumstances, the search of Mr. Harris's vehicle fails, namely because the only perceived indicator, the head snap, was too attenuated.  But its more than that, the video shows how wrong the search was.  Does the Court think there was any version of this situation where Trooper Sonstrom doesn't search Mr. Harris's vehicle?  Trooper Sonstrom appears to be the probable cause closer, law enforcement can count on him to search a car no matter what.  This is so very wrong and prohibited under the Fourth Amendment.

Because of all of these reasons, it is requested that the Court find Trooper Sonstrom lacked probable cause to search Mr. Harris's vehicle, and suppress the evidence discovered in the vehicle.  Mr. Harris also reiterates his arguments in his Motion to Suppress.

/

/

/

/

/

17

Respectfully submitted,

/s/ James Amberg

_____

AMBERG & AMBERG, PLLC
James W. Amberg P68564
Attorneys for the Defendant
32121 Woodward Avenue, PH
Royal Oak, MI 48073
248.681.6255
March 18, 2026                          248.681.0115 (fax)

### *Certificate of Service*

I, James W. Amberg, attorney for the Defendant, certify that on March 18,2026, I caused a copy of this Brief to be served upon the Clerk of the Court via Utilities.

/s/ James Amberg

_____

James W. Amberg
Attorney at Law P68564

AMBERG & AMBERG, PLLC
ATTORNEYS AND COUNSELORS
32121 WOODWARD AVENUE, PH
ROYAL OAK, MI 48073
WWW.AMBERGLAW.NET

(248) 681-6255

18