UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

WAYMON HARRIS, D-14,

      Defendant.

                            /

Case No. 19-CR-20322
HON. MARK A. GOLDSMITH

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Dkt. 625)

Before the Court is Defendant Waymon Harris's motion to suppress evidence (Dkt. 625). For the reasons set forth below, the Court denies the motion.[1]

### I.   BACKGROUND

Harris is charged with conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute, in violation of 21 U.S.C. § 841; and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Superseding Indictment (Dkt. 145). Harris challenges the legality of the traffic stop and subsequent searches of his car and residence which lead to him being charged with these crimes. Mot. at PageID.3614–3617.

---

[1] In addition to Harris's motion to suppress evidence, the briefing includes the Government's response (Dkt. 631), Harris's supplemental brief (Dkt. 709), and the Government's supplemental brief (Dkt. 710). The Court also held two hearings on this motion on October 28, 2024 and February 5, 2026. DEA Special Agent John Patrick Hill and Michigan State Police Trooper Ben Sonstrom testified at the October 2024 hearing. See 10/28/24 Hr'g Tr. (Dkt. 644). Dr. Mary Cablk, PhD testified at the February 2026 hearing. See 2/5/25 Hr'g Tr. (Dkt. 704). The motion includes an exhibit clip from Sonstrom's dash camera. See 10/29/24 Text-Only Notice. This clip can be accessed via the Clerk's Office.

In the spring of 2018, the Oakland County Gang and Violent Crime Task Force (Task Force) was investigating Neil Thomas and his co-conspirators, including Harris, for alleged drug trafficking activities in Pontiac, Michigan. 10/28/24 Hr'g Tr. at PageID.3676. Law enforcement identified Harris through a confidential source and through jail calls. Id. at PageID.3676–3677. During their investigation, law enforcement obtained a search warrant to ping Harris's phone and a search warrant to place a tracking device on his vehicle. Id. at PageID.3679. Law enforcement also conducted physical surveillance at a residence on Kensington Street in Detroit. Id.

On April 24, 2018, law enforcement orchestrated a plan for the confidential source to meet with Harris and negotiate the purchase of a kilogram of heroin. Id. The source and Harris met at a bar on Michigan Avenue in Detroit; law enforcement provided surveillance. Id. at PageID.3680. After the meeting, the source reported to law enforcement that they had conversed with Harris about buying kilograms of heroin. Id. at PageID.3682–3683. During the meeting, the source and Harris negotiated the price of the kilograms and agreed that the source would pay $65,000 for one kilogram and the price of the second kilogram would be $20,000. Id. at PageID.3684. The source and Harris also discussed whether the source could obtain a sample of Harris's heroin so that the source could ascertain its quality. Id. at PageID.3683. Later that same day, Harris contacted the source via phone. Id. at PageID.3685. The source put the call on speaker phone and law enforcement listened. Id. Harris told the source that he had received a sample of the heroin for the source and the two arranged a second meeting at the same location for the source to obtain the sample. Id. at PageID.3686. Law enforcement surveilled the second meeting, after which, the source turned over the sample that Harris brought to law enforcement. Id. at PageID.3686–3687. During the second meeting, Harris told the source he only had 500 grams of heroin to sell and he quoted the source $30,000 for the 500 grams. Id. at PageID.3687.

That same day, during multiple monitored phone calls, the source and Harris arranged to meet up a third time to complete the transaction.  Id. at PageID.3689–3690.  Law enforcement planned to pull Harris over on his way to meet with the source to complete the transaction, believing that he would have 500 grams of heroin in his vehicle.  Id. at PageID.3693.  Law enforcement contacted Michigan State Police K-9 Trooper Ben Sonstrom and made plans to conduct the traffic stop.  Id. at PageID.3694, 3740.

At approximately 6:10 p.m. Sonstrom observed Harris's vehicle driving westbound on I-94 going 80 mph in a 55-mph zone.  Id. at PageID.3742; 3744.  Sonstrom pulled Harris over and spoke to him through his passenger side window.  Id. at PageID.3744, 3747.  Sonstrom asked Harris to exit the vehicle, and Sonstrom put Harris in his patrol car.  Id. at PageID.3747–3748.  Sonstrom asked Harris for consent to search his vehicle; Harris declined.  Id. at PageID.3748.

Sonstrom was a canine operator and assigned a canine partner, known as "Otto."  Otto was in Sonstrom's patrol vehicle when he stopped Harris.  Id. at PageID.3742.  After Harris was placed in the patrol car, Sonstrom and  Otto then conducted an exterior sniff of Harris's car approximately five minutes into the stop.  Id. at PageID.3750.  During the sniff, Otto's "behavior changed" indicating he detected the odor of narcotics.  Id.  He "paus[ed]," pointed his nose "towards the door seam of the vehicle," and his head "snap[ped]."  Id.  Otto also "pulled" which Sonstrom testified meant that Otto wanted to go back to the source of the odor.  Id. at PageID.3752.  When Sonstrom and Otto went back to the area where Otto initially changed his behavior, Otto's nose again went up and he looked at Sonstrom, which Sonstrom stated meant that Otto was looking for a reward.  Id. at PageID.3752.  Otto did not issue a "final response," which for Otto is to sit.  Id. at PageID.3738–3739, 3750.

Because of Otto's alert, Sonstrom searched Harris's car and found suspected heroin in Harris's glove compartment. Id. at PageID.3754–3755.

## II. ANALYSIS

The Fourth Amendment provides that, "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The proponent of the motion to suppress bears the burden of establishing his Fourth Amendment rights were violated. United States v. Rodriguez Suazo, 346 F.3d 637, 643 (6th Cir. 2003).

Harris makes four arguments regarding why his Fourth Amendment rights were violated: (i) the stop of his vehicle was unlawful, (ii) the length of detention prior to the dog search was unlawful, (iii) Otto's indication was insufficient probable cause to search his car; and (iv) the subsequent search of the residence on Kensington Avenue was unlawful as it was predicated on the unlawful traffic stop. Mot. at PageID.3614–3617. The Government counters by arguing that the initial stop was lawful, the length of detention was reasonable, Otto's alert established probable cause, and the warrant to search Harris's home was lawful. Resp. at PageID.3633–3642. As explained below, the Court finds no constitutional violation.

### A. Traffic Stop

The Fourth Amendment's "protections extend to brief investigatory stops of…vehicles that fall short of traditional arrest." United States v. Lyons, 687 F.3d 754, 762 (6th Cir. 2012) (punctuation modified). "In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." Id. at 763. "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than

mere suspicion." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008) (punctuation modified).

Reasonable suspicion involves:

> more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a Terry stop.

Lyons, 687 F.3d at 763.

Harris argues that Sonstrom had neither reasonable suspicion of criminal activity nor probable cause of a civil infraction. Mot. at PageID.3614. Harris asserts that it is unclear what Sonstrom knew related to Harris's alleged narcotics trafficking when he made the traffic stop. Id. Harris also argues that he does not appear to be speeding because the dash camera demonstrates that he was moving with traffic. Id.

The Court disagrees. The Government has provided two justifications for Harris's traffic stop. Sonstrom testified that he observed Harris going 25 mph over the speed limit. 10/28/24 Hr'g Tr. at PageID.3744. Harris's statement that he could not have been speeding because the video shows that he is going with traffic does not contradict this testimony; all the traffic may have been exceeding the speed limit. Further, Sonstrom also had reasonable suspicion of criminal activity as he had been told by the Task Force that Harris was suspected of transporting narcotics. Id. at PageID.3694, 3741, 3749–3750 "When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant." Blair, 524 F.3d at 748. The Sixth Circuit has held, "police officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." Id. The stop was lawful.

**B. Length of Detention**

Harris next argues that the length of detention prior to the dog search was unlawful.  Mot. at PageID.3614–3615.  Harris contends that being taken out of his vehicle, frisked, and put into the patrol car prolonged the traffic stop and was unreasonable.  Id. at PageID.3615.

After conducting a lawful traffic stop, police officers may investigate the suspected traffic violation for as long as is reasonably necessary to complete that task.  Rodriguez v. United States, 575 U.S. 348, 354 (2015).  Traffic stops are "analogous to a so-called Terry stop."  Rodriguez, 575 U.S. at 354 (punctuation modified) (citing Terry v. Ohio, 392 U.S. 1 (1968)).  Officers may conduct a brief, investigatory stop—a Terry stop—when an officer has a reasonable, articulable suspicion that criminal activity is afoot.  Illinois v. Wardlow, 528 U.S. 119, 123 (2000).  Reasonableness, under the Fourth Amendment, "is measured in objective terms by examining the totality of the circumstances."  Ohio v. Robinette, 519 U.S. 33, 39 (1996).  "If an officer develops reasonable and articulable suspicion of criminal activity during a stop, he may extend the traffic stop long enough to confirm or dispel his suspicions."  United States v. Winters, 782 F.3d 289, 296 (6th Cir. 2015) (punctuation modified).  Any extension "must be limited in scope and duration."  Id. (punctuation modified).

The length of Harris's detention was not unreasonable.  At the time Sonstrom stopped Harris, he observed a civil infraction and he had been told that Harris was transporting narcotics.  10/28/24 Hr'g Tr. at PageID.3694, 3741, 3744, 3749–3750.  Further Sonstrom testified that he brought out Otto to conduct the dog search about five minutes into the stop.  Id. at PageID.3750.  Five minutes is not an unreasonable amount of time for a traffic stop.  See e.g., United States v. Collazo, 818 F.3d 247, 257–258 (6th Cir. 2016) (finding that 21 minutes to complete a traffic stop was not unreasonable); cf. United States v. Crawley, 526 F. App'x 551, 557 (6th Cir. 2013) (stating that 30 minutes was "significantly" longer than a normal traffic stop but that it was reasonable

when an officer had reasonable suspicion of further criminal activity).  Further, the Sixth Circuit has held that when police have reasonable suspicion to believe that an individual has narcotics in their vehicle, it is not unreasonable to detain an individual for 30 to 45 minutes while waiting for a narcotics dog.  United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005).  Accordingly, the length of the stop was not unreasonable.

### C.  Probable Cause to Search Harris's Vehicle

Harris next challenges whether Otto's alert provided sufficient probable cause to search his vehicle.  Mot. at PageID.3616; Harris Supp. Br. at PageID.4495–4500.

"[A]n alert by a properly trained and reliable drug-detection dog is sufficient to establish probable cause for the presence of a controlled substance."  Winters, 782 F.3d at 304 (punctuation modified).  "For a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established."  United States v. Diaz, 25 F.3d 392, 394 (6th Cir. 1994) (punctuation modified).  "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."  Florida v. Harris, 568 U.S. 237, 246–247 (2013).  "The question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."  Id. at 248.

The Court finds that Otto's alert was sufficient to establish probable cause.  Sonstrom testified that at the time Otto sniffed Harris's car, he had worked with Otto for approximately five years and that they had conducted "a minimum on average" of 350 callouts a year.  10/28/24 Hr'g Tr. at PageID.3736.  Sonstrom also testified that Otto's behavior communicated to him that Otto detected narcotics—even though Otto did not sit, which is his trained final alert.  Id. at

PageID.3750. The behaviors Sonstrom observed were Otto pointing his nose up to the "seam of the vehicle," "pausing," "snap[ping]" his head, and "pulling" to return to the source of the odor. Id. at PageID.3751–3752. Sonstrom also testified that it was not unusual for Otto not to give a final response, even when he detected the odor of narcotics and that for his dogs, behavior changes were more common than final responses. Id. at PageID.3739–3740.

There is video taken from the dashboard of Sonstrom's vehicle that captured the search. During his testimony, Sonstrom watched the video and pointed out where Otto's described behaviors occurred. Id. at PageID.3751–3753. After viewing the video, the Court cannot definitively see the behaviors that Sonstrom described as the video is taken from some distance. However, the Court credits Sonstrom's testimony as he was physically present during the search, has worked extensively with Otto, and based on this relationship, could best identify his alerts.

Harris's arguments to the contrary are not persuasive. Harris argues that because Otto's final alert is to sit and he did not do so here, there was no probable cause to search his vehicle. Harris Supp. Br. at PageID.4496; 10/28/24 Hr'g Tr. at PageID.3750. Harris asserts that the "changes in behavior" that Sonstrom testified Otto displayed were "antecedent behavior" and not a final alert, because these behaviors are not mentioned in his training records. Id. at PageID.4497.

Courts have held "an alert, or a change in a dog's behavior in reaction to the odor of drugs, is sufficient to establish probable cause to search a vehicle, and that a final indication is not necessary." United States v. Moore, 795 F.3d 1224, 1232 (10th Cir. 2015) (citing United States v. Parada, 577 F.3d 1275, 1282 (10th Cir. 2009) ("Thus, the general rule we have followed is that a dog's alert to the presence of contraband is sufficient to provide probable cause. We decline to adopt the stricter rule urged by Mr. Parada, which would require the dog to give a final indication before probable cause is established.")); see also United States v. Clayton, 374 F. App'x. 497, 502

(5th Cir. 2010) ("So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs."). "Requiring a drug detection dog to give a final response to demonstrate its reliability would be contrary to the Supreme Court's explanation that determining probable cause is 'a more flexible, all-things-considered approach….'" United States v. Braddy, 11 F.4th 1298, 1314 (11th Cir. 2021) (declining to find that a drug dog was not sufficiently reliable to provide probable cause because it did not perform its final alert) (punctuation modified). Accordingly, Otto's failure to sit does not cast doubt on his ability to reliably provide probable cause.

Harris's citation to United States v. Rivas, 157 F.3d 364 (5th Cir. 1998) is unavailing. The witness in Rivas explained that the dog had "casted" which the witness described as a weak alert. Id. at 367–368. The court held that the Government had not shown that "casting" was equivalent to an alert. Id. at 368. The court emphasized that the Government had not called the dog's handler as a witness to explain why the dog casted and that it could not rely on the "lay testimony" of an official who was not a dog handler. Id. The instant case is different. Sonstrom is Otto's handler, and he testified that Otto does not always have a final alert when he detects the odor of narcotics. 10/28/24 Hr'g. Tr. at PageID.3739–3740. Thus, Rivas is not persuasive.

Similarly, Harris's citation to United States v. Heir is factually distinguishable. 107 F. Supp. 2d 1088, 1091 (D. Neb. 2000). The dog in Heir was trained to scratch when he "located the strongest source of the drug odor, [but] he did not do so in this case." Id. During the stop at issue in this case, the trooper testified that the dog alerted by "sniffing more intensely around certain areas." Id. The court found that this testimony was insufficient to establish probable cause because there was not an "objectively observable indication by the dog of the presence of drugs." Id.

9

(punctuation modified). Harris argues that <u>Heir</u> is on point because Otto's head snap "was too attenuated." Harris Supp. Br. at PageID.4500. The Court disagrees. Here, unlike in <u>Heir</u>, the canine's handler testified compellingly that head snapping, pausing, and returning to the source of the smell were alerts that Otto frequently displayed at the odor of narcotics. 10/28/24 Hr'g Tr. at PageID.3739–3740, 3750–3753.

Harris also argues that Otto's purported alerts are not reliable because Sonstrom was biased, the theory being that he had been told that there were narcotics in the vehicle so he misread Otto's behavior. Harris Supp. Br. at PageID.4497. The theory is based entirely on the testimony of Harris's expert, Dr. Cablk. Dr. Cablk is a retired research professor who consults on the science of canine detection. 2/5/26 Hr'g Tr. at PageID.4412–4413, 4416. Dr. Cablk's opinion is based on her review of Otto's training records, the video of the stop, and the transcript of Sonstrom's testimony. <u>Id.</u> at PageID.4428–4429. She opined that because Sonstrom "believed there were drugs in the vehicle and he was told to search the vehicle" that contributed to his "misinterpreting" Otto's behaviors. <u>Id.</u> at PageID.4439. Dr. Cablk testified that if Otto had "sniffed independently at the end of the leash pulling his handler, exhibiting behaviors such as not wanting to leave any area of the vehicle and then sat" she would be satisfied that Otto's alert was reliable. <u>Id.</u>

This argument is conclusory. And it disregards the long-standing relationship between Sonstrom and Otto, who, at the time of the search had worked together for five years on an average of 350 callouts a year. <u>United States v. Thin Elk</u>, 148 F.4th 595, 601 (8th Cir. 2025) (finding no clear error in a magistrate judge's decision that the same argument with similar testimony by Dr. Cablk was "speculative and assuming"); 10/28/24 Hr'g. Tr. at PageID.3736.

Dr. Cablk testified that she has never trained, deployed, nor tested Otto. 2/5/26 Hr'g. Tr. at PageID.4455. She also testified that she had never worked or trained with Sonstrom. <u>Id.</u> Dr.

10

Cablk does not explain how she reached her conclusion, other than her knowledge of biases in general.  Id.  at PageID.4427–4428 (testifying that handler's bias is "well established" and explaining that the final alert can overcome handler's bias).  Knowledge of handler's bias, in general, does not mean that it occurred here.  The Court credits Sonstrom's history and experience working with Otto over Dr. Cablk's speculative testimony.

Lastly, Harris argues that video of Otto's search shows that Otto does not spend that much time at the vehicle, it does not show that his head snaps, Otto cannot be seen pawing at the vehicle, and Otto cannot be seen breathing differently.  Harris Supp. Br. at PageID.4497.  The parties agree that Otto pointed his nose towards the vehicle; Dr. Cablk testified that from her review of the video, she saw Otto point his nose towards the vehicle, but she did not see him change pace or resist leaving any part of the vehicle.  2/5/26 Hr'g Tr. at PageID.4438.  As stated above, the video does not categorically resolve this dispute, but the Court finds Sonstrom's testimony credible based on his history working with Otto.

Although the parties have focused on whether Otto's behavior supplied Sonstrom with probable cause to justify the search, probable cause is justified even without taking into account Otto's involvement.  The justification can be based on the fact that the source had been in contact with Harris all day about purchasing heroin and because Harris had told the source that he was on his way to meet them to complete the transaction.  10/28/24 Hr'g Tr. at PageID.3693–3694.  This would amount to probable cause that the automobile contained drugs, even without the additional evidence supplied by Otto's responses.  See United States v. Arnold, 442 F. App'x 207, 210–211 (6th Cir. 2011) (upholding a warrantless search of a vehicle where law enforcement obtained a tip that drug dealing was occurring out of the vehicle, they corroborated the tip by physical surveillance, they arranged a controlled buy, and the defendant drove to the location of the

11

controlled buy).  Given that there was probable cause that the drugs were located in an automobile, the automobile exception would avoid the need for a warrant.  Resp. at PageID.3640; see also United States v. Graham, 275 F.3d 490, 510 (6th Cir. 2010)("[A] vehicle may be searched, without any indication of exigency, if the searching officers have probable cause to believe that it contains instrumentalities or evidence of the crime.").

There was sufficient probable cause to search Harris's vehicle.

### D. Kensington Residence Search

Harris also argues that the evidence found during the search of the residence at Kensington Street should be suppressed because the search warrant was "predicated primarily" on the suspected narcotics found as a result of the search of his vehicle.  Mot. at PageID.3617.  Because the Court finds that law enforcement had  probable cause to search his vehicle, the resulting search warrant based on the vehicle search is also upheld.

### III.    CONCLUSION

For the reasons stated above, Harris's motion (Dkt. 625) is denied.

**SO ORDERED.**

Dated: June 16, 2026                                    s/Mark A. Goldsmith
Detroit, Michigan                                       MARK A. GOLDSMITH
                                                        United States District Judge

12

**<u>CERTIFICATE OF SERVICE</u>**

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 16, 2026.


                    s/Joseph Heacox\
                    JOSEPH HEACOX\
                    Case Manager